Thank you, Your Honor. May it please the Court and distinguished judges, my name is Danielle Beach Oswald and I represent the petitioner Mr. Douglas Leke who is from Cameroon and was denied asylum by the immigration judge and by the board. We would ask that this honorable court vacate the board's decision and remand for further proceedings. Just briefly, Cameroon since November 2017 has been in a crisis mode where hundreds of women, children, and teachers, attorneys who are Anglophones have been killed and there's been massive internal displacement. Even U.S. Senators have pushed to protect Cameroonians from mounting violence as the U.S. Ambassador in Cameroon has also discussed. Mr. Leke went to school in Douala and worked there until he had to go back to work on the cocoa farm in Mayuka, which is in the Anglophone area. He was arrested on two occasions on May 31, 2018 for one month. He escaped and then again arrested on October 28, 2018. Villages, homes, and hospitals have been burned and destroyed and children have been unable to attend schools in the Anglophone area and the situation has only gotten much worse in the last year. So this is the background against which we are discussing this case. Now throughout Mr. Leke's hearing and through his direct testimony from the jail there was pervasive problems with the BTC technical failures between the jail and the court and communication between the Arlington court and Farmville. The repeated instances of indiscernibles that led to information speculation and conjecture and all this we would argue created a lot of confusion in the parties. I don't think that there is any dispute on the fact that there was a lot of problems and that there was confusion. The judge herself said we haven't been having this kind of trouble for a long time. Problems with distortion, stuff freezing and everything. Today we're having so many problems at JA 135 and 136. This isn't, again she says at JA 140, this is we've dropped again. I feel bad for him too, Mr. Leke. Then again, I can't work like this. It's torture. That's kind of ironic considering the kind of case that this is, your honor. And again, I hate the fact that it's the middle of direct. It's really hard on the parties. You're in the middle of direct and you're going to lose your train of thought. And then she says this is exhausting. It's just adding to the fatigue of everything. JA 146. Again, in JA 146, she says he felt. Counselor, if I could ask you a question on that point. Obviously, we all are now much more familiar than we would like to be with the client. Does your client contend that he was unable to present to the immigration judge by virtue of the technical difficulties? And where does he ever argue that he was prejudiced? Well, your honor, we did argue that before the board. The problem with due process is that it does require a meaningful opportunity to be heard. And it's credibility in immigration cases, both pivotal and central, because that testimony alone can create a burden, satisfy the burden of proof. Was there any evidence or argument that he did not get to make? Well, looking at his declaration, your honor, the declaration was over nine pages. A lot of that was not put into his testimony or asked. There was also a witness there available, his uncle, who could have testified about the chain of custody of the pictures, about a lot of different things concerning the credibility of the case. And he was not allowed to testify, your honor, by the judge. The communication really affects the proceedings from day 38 to 237, even though the court was the exclusion of the relative. Was that based on a technical difficulty or a rule of evidence? Your honor, my understanding was that it was when counsel asked that now they were going to have Bernard Faminka testify. The judge said, no, he cannot testify. And the only thing she said was that he cannot go and testify now. And apparently because he'd been in the courtroom. Well, usually the government always sequesters witnesses. And I don't know why he was in the courtroom. But his testimony alone would have cleared up a lot of these problems. The inconsistencies, if there were any, it would have clarified a lot of the different things. Also, counsel attempts, the same Eistein counsel, and before that, the cases like Russo, this case is not like Russo at all. Because in Russo, Russo was not resolved because he was unable to meet the second prong showing prejudice. I think in this case, demeanor and nervousness and responsiveness, which is all part of credibility, was affected by the fact that he was not able to, every time he would start, it would be interrupted. Also language. Counsel, can I follow up on Judge Agee's question about that point? My understanding from the record is that the immigration judge in this case made an explicit finding that her credibility determination was not based on the technical difficulties, but rather based on lack of demeanor and other independent evidence throughout the hearing, beyond those that were encountered because of the technical issues. So, I mean, are we required to give that finding the weight that it deserves on appeal? Absolutely, Judge Diaz. She did say that. We feel that she said that, but then yet she still made the determination based on the fact of demeanor, and I don't know how she was able to make that evaluation because she did not get into specifics. Here, I think for credibility, we're looking at the totality of the circumstances. What were the issues with credibility and how does this process work? And the fact that the judge said that she did not consider that, I don't think that the record holds that to be true. Well, I mean, demeanor is but one aspect of the credibility finding, but she made other determinations regarding his inability to the fact that although he had an explanation for why in the visa application, the application indicated that he was a resident of Douala, therefore casting some doubt as to whether or not he was actually persecuted given the geographic distance that we're talking about here. But there was a separate aspect of the record involving a marriage certificate where that evidence appeared and he had no explanation for that, and I don't think you've given an explanation in your brief about that. So that's just one example of the various record findings that the immigration judge, I think, was entitled to hang her hat on in making an adverse credibility finding. If I may address that, Your Honor, on his occupation and residency, if I can just briefly explain how the process works, that when a client comes across the border, what happens is they get a very detailed interview by Customs and Border Patrol that is in ICE's record, and they do not use it or they give it to the court unless they use to impeach. So clearly here in this record, that was totally consistent what he said after traveling through all these countries. Secondly, at the border while in jail, and Mr. Leckie is still detained after a year, they get what's called a credible clear interview. That interview is also a Q&A, and it's at page JA-568-571, and it's very detailed and very long and asks a lot of questions to him. Again, not a single question was asked or brought out about that, which means that it was totally consistent with his then declaration of nine pages. If we look at his 589 application, which is the application when you apply for asylum where you put all your information at JA-480, we see that he, in fact, does list the DWALA address and the workplace, and all of that is listed, and his moving back and forth among Muyuka, Buya, Dwala. He was on a farm. There's no address there, but he does give the correct dates in his application, in his declaration, in everything that he said, there is the correct dates. The only thing that they have, Your Honor, as you said, is the visa application, which he said his aunt even used her own email on the visitor's application, JA-215. She completed it. He gave her the information. He says that the information, of course, that he did give was correct. It just wasn't correct at that time because he was no longer working there. He said that in Q-12, he never saw the visa application. Here we have the marriage certificate. Also, it was done in 2018, and maybe they just used his Cameroon ID or whatever. I don't know why it still said Dwala. Dwala is a real address. The farm doesn't have a real address, but those two things are the only things, one of which he had nothing to do with. The other things, his application, 589, his credible fear, his CFI, his declaration, which is very long and detailed, his daughter's birth certificate, which was done in 2018 at JA-240. All of those say that he specifically lived in Muyuca, which, by the way, Your Honor, and throughout the record, it's not even said as Muyuca. It's said as Makala. Even in the brief that was filed, it's referred to as Makala, which isn't a real place. I would say that that inconsistency on the visa is outweighed by all the other evidence. As to the second claim of inconsistency, which was Mr. Bernard Kaminka not being a sibling, but being an uncle, well, the aunt filled out the application. That was only a contact person. It had nothing to do with a brother filing for him. There was no application. There was no birth certificates or any of that stuff, which, by the way, takes 12 years. That was a non-entity. Mr. Bernard Kaminka himself was in court. He is the one, and on the 589, he is not listed as a sibling. The one that under pertinent, Mr. Leque testified too. In the application itself, Mr. White says sibling. When asked, who is this person on direct and on cross, he says immediately, he's my uncle, my mother's younger brother. Had they had Mr. Kaminka testify, a lot of this stuff that was used as somewhat credibility issues could have been completely cleared up, but the judge was in a rut. She didn't want to hear anymore. She was frustrated by the whole process. Therefore, she didn't allow Mr. Kaminka to testify, which would have been the correct thing to do, and also the thing that would have allowed the chain of custody on the photos that were used as exhibits to be discussed and heard. We would say that that itself is really not an and Mr. Kaminka, who she said was in court and available to testify. He was listed as a witness. He would have been able to testify. He should have been able to testify. The third inconsistency, which is the only other one listed, is that the judge goes back and forth. She says, well- Counsel, if I could ask you just on the point that you just made, was there an objection made before the IJ? I don't recall reading any discussion about there being an error by not allowing the uncle or brother to testify. Is that in your brief anywhere? Your Honor, it isn't as a separate issue, but it is discussed that he was present in court and available to testify as a witness and that his declaration is in the record. Therefore, normally that's what an immigration judge would do. Have you ever argued anywhere that that was an error? Indirectly, yes. I would say yes, Your Honor. It is both in the brief and the BIA and also in the fact that- Did counsel themselves and CARE say specifically we object? They asked to have- The judge said no. They didn't say, for the record, we object to that, if that's what you're asking, Your Honor. They did proffer that witness and call that witness and it was refused, correct? Correct, Your Honor. So the objection stands. If you make the motion as denied, I think there's nothing that charismatic necessary beyond that, is there? Do you know? No. I mean, at that point, there's nothing that counsel could have done. That's part of the- Ms. Beachhouse, well, I guess that's part of the analysis and we'll go back to the record and see if that's correct. But then the other half is whether or not this is issue that you raised on appeal to the BIA and to us. And I think the answer to that question from Judge Agee was a no. Is that right? Your Honor, I would say that it's certainly- I don't have the exact quotes, but certainly, yes, it is in the brief that discusses that he was available. It was also in esteemed counsel's brief that- Well, I mean, it is in the brief. That could mean a lot of things. All kinds of things are in the brief. Your name is on the brief. But the question is whether or not the issue was properly raised in the brief. The issue was raised, Your Honor, that Mr. Fomenko was available to testify and that- And that the IJ made a mistake in not allowing it? Is that in the brief? Is that what you're representing to the court? I would have to check if those exact words were used. But certainly, it was discussed that he could have discussed chain of custody of the photos and he had intimate knowledge and information that could have been helpful to the court. Your Honor, if I'm- I see I'm running out of time. If I may proceed with the third inconsistency, which is on the two assaults of Bavanga Prison, there were two. One in May 30th before he was executed. The July article at J237 specifically says, in July 2018, last month, unidentified gunman stormed age-old prison in Bavanga. Last month to me means June. There was another one in May. But all parties agreed that there was one in May. As far as goes on that particular incident, 160 inmates actually escaped. So, on the corroboration of what was asked for corroboration, I think here the judge did somewhat confuse the burden of proof with credibility and corroboration. There was a lot of corroboration. There was his testimony. There was a witness there who would have been available to testify. He was his uncle. There was two other uncles' affidavits. There was numerous pictures of his home that had been burned down after he left. There was pictures of other things that had happened when he went to the hospital. For the judge to simply discount these family affidavits as self-serving, that directly contravenes this court's recent case in the country documents that hundreds of hospitals are not functioning in dangerous areas. In fact, the nurse told him specifically to leave this country the same day, and his family picked him up. I see that my time has run out. May I just complete my thought? Yeah, yeah. You may. Thank you, Your Honor. The other things that the judge asked for were, he did explain for her to ask for something from a smuggler. That's unrealistic, totally. Or some kids that helped him in the neighborhood who were paid, who just showed up for two hours. Or the cocoa farmer who had no electricity or phone, where he was hiding. Or people he was arrested with. These are not reasonable. And he was never given an opportunity to say why he didn't provide those. The ones that he was asked, he did explain why he didn't have. Thank you, Your Honors. And we would ask that this case be remanded for further proceedings to have a full and fair hearing. Thank you, Ms. Oswald. Ms. Melnyk? May it please the court, Karen Melnyk on behalf of the United States. I'd like to begin, if I could just, where the discussion with the uncle and whether or not that was raised by counsel to the board or to this court, I would represent that it was not made an issue in terms of an abuse of discretion. Certainly, I would have responded to such an argument if it had been in the brief. So I would suggest that and argue that it was not made an issue regarding the uncle's testimony. And the fact that he remained in the courtroom, you know, counsel in the courtroom, petitioner's counsel controls their evidence, and that was up to them to have him excused. Is that a rule, a procedural rule for the hearing? I don't know if it's a rule that immigration judge, I think, you know, counsel knows what evidence they're going to present. And if they leave a witness in the courtroom, you know, that's their call. Well, that's what we know, we function by rules in terms of procedures. So there's no rule, you're just saying that you as a counsel, you would have done it different, correct? Well, it would be my, if I was on the other side, it'd be my burden of proof. So I would be responsible for that burden. Leslie, I just want to sequester witnesses is not necessarily automatic. It's still, if counsel intended to call that witness, then it was her responsibility to not have them in the courtroom. Again, I'm not really fully prepared to make this argument because this argument was not made to the board or to the brief. So I would suggest that it was failure to exhaust and in any event, waived. Well, it's the reason why the board insists that I'm just, and I appreciate that you're not prepared to answer, but in the context where a lot of this is that you're saying the judge finds that it's bereft of testimony from the uncle that could have cleared it up, but then the uncle wasn't allowed to testify. Well, it's speculation that the uncle could have cleared up everything. I would suggest the uncle cannot clear up the fact that this petitioner, you know, either you believe that he's a contact center telephone person in Douala or he's a cocoa farmer in Mayuka because the record does not compel the conclusion that he's a cocoa farmer in Mayuka during the relevant time because there is contradictory evidence supplied by him. And after, you know, he tried to get into the United States or was on the route to trying to have a, you know, go through visa and as late as May, 2018 at his counselor interview, although he conveniently doesn't remember the details of that interview and conveniently alleges that his aunt filled it out for him, although he supplied the information and didn't make any corrections to it when he was interviewed. But yet, if he's a- Does this record reflect his level of literacy? I don't know. Excuse me, counsel. Then why is it unusual that he would tell someone the information for someone else to fill it out for him if there's no record of his literacy? I mean, you said you keep using the word conveniently, meaning, and obviously you use that in a derisive way, which you can because you're a counselor, the other side. But how is that wrong? Because he, someone helps him fill out something and people in this country, United States, the richest country in the world, they don't have the means and the abilities to be able to fill out forms and other people fill them out for him. And how do you suggest that that in itself is indicative that it's not true? I'm not suggesting even necessarily that it's untrue that he had his aunt filled it out for him, but he acknowledges that he was the one that supplied the information. He was the one that appeared for his interview. And yet when he, if I would direct your honors to the record of 196 through 200, where he's trying, where he's cross-examined on this, I would say case defining inconsistency regarding where he lived and what he did for a living at the relevant time. Because if he is living in Douala as a contact center agent, then none of these events happened to him. They very well, and were happening to many Anglophiles in this area of Ambazonia, this Northwest Southwest region of Cameroon. But the record does not compel the conclusion that he was living there at that time as he says. And I think the biggest sticking point as was brought out by your colleague is the marriage certificate in April of 2018. There's no suggestion that his aunt filled out his marriage certificate. And his marriage certificate says he was a telephone, a contact person or advisor living in Douala. Yet his 2016 to 2018, he was a cocoa farmer living in Mayuka. Well, they both can't be true. And therefore the record does not compel the conclusion that he was a cocoa farmer living in Mayuka. With respect to the, the televideo and those interruptions, I think the court's Rusu opinion is instructive. Although it was ultimately decided based on a lack of prejudice, the court details the factors to consider when such a problem has arisen and whether or not there is in fact a violation or an error that needs to be, that would require remand. And a meaningful opportunity to present the claim, a substantial amount of time to explain the IJ's sincere efforts to understand the testimony, numerous opportunities to elaborate and clarify the testimony. And at bottom, whether or not the immigration judge understood the factual predicate for the asylum application. Now, as your honors know, this was not a off the cuff oral decision made at the time. This was an 11 page single spaced written decision by the immigration judge. It was, I would suggest very clear that the immigration judge understood the factual predicate of the claim. And again, as, as your honors brought up, you know, to this day, what petitioner was unable to address what claim, what facts. Council did mention he was not able to testify about everything in his declaration, but the declaration was in the record and certainly considered by the immigration judge. So, and again, at the time that this happened, and I have the exact time period, the merits hearing began on page 102 and the problems arose at AR 121 and continued on and off until AR 146. So it's a section of the direct testimony. The remainder, once the petitioner was moved to another room, there were no more problems at all with the testimony. The rest of this direct, all of cross, immigration judge's questions, redirect. There was no other problems and no issue raised before the immigration judge at the time by council in terms of, Hey, we need to just pick another day. This isn't working out. There's, there's too many problems here. In fact, council asked the immigration judge if perhaps they could just submit a written statement and just be cross-examined on it and have redirect. Fortunately, that, that wasn't necessary. The problem was fixed and the testimony continued uninterrupted. Again, as was already brought out that the demeanor factor to the adverse credibility was not relied upon by the immigration judge with respect to the televideo. Now, your honors, if I could direct you to AR 110, the immigration judge had already started noting before there were any problems at all with the televideo that the, you know, the testimony, what was being brought out seemed, wrote and the immigration judge brought it out again at page 153, 154 that, you know, the, the way it was coming out was not, did not seem credible to him. So council was actually on notice at that point. And if in common sort of commonsensically, if the televideo had been a problem with the demeanor, you know, interruptions disjointed this was not the demeanor finding by the immigration judge. Like I couldn't follow it, you know, it just seemed out of order. In fact, it was the exact opposite demeanor finding that it seemed rehearsed. Well, you know, that's, you know, it seems rehearsed when you say things like that. What does that mean? For example, I'm sure you're, you're prepared, you prepare for this argument. And somebody said, well, the argument seemed rehearsed. Well, it should, because I'm sure you did your work, you went over it. But that's as if that means that it's not true. When someone is nervous, I mean, for example, this is an arduous situation, all those countries he came through. I mean, it's almost like, not you, but we look at these cases, like we're talking about a picnic or something, or some primrose pad. It's a long and arduous road to get you there. And you're there, and you say it sounds rehearsed. Or maybe it is, because maybe you go through your head over and over and over, because you want to try to get the facts right. Then it means not true. When you say things like that, to me, that doesn't mean anything. I mean, what does rehearse mean? Tell me that you, you, this, we have a record, this is all I think. What does that mean to say someone testified under oath and it seemed rehearsed? What does that mean? Well, I think in this case, the immigration judge was noting, and perhaps this was the fault of counsel as well, that the level of detail and that the language that he used in court was the exact, the exact wording in his declaration. I think that was the point that the immigration judge was trying to make. I'm, I hope you think well prepared for this argument, but every time I sort of talked about it to myself or out loud, it didn't come out the same way every time. I, you know, I didn't memorize it. I'm glad that you said that because that's the catch-22 in most of these cases. You said it very well. You said, well, you know, it doesn't come out the same way as the declaration did, but when it does, it's inconsistent. Aha, you see there? Here he said X, but there he said Y. So either you, one or the other, either you, it's so important. And then go back to the, what the, you said the final decision had nothing to do it, but these are the judge's words, right? Described it as torture. The situation was maddening. It stopped me when I'm not quoting her words. I can't work like this. Is that correct? Yes, your honor. I think at that time, the immigration judge was extremely frustrated and worked diligently to fix the problem. And I think as I brought out in my brief, if you note, every time there was an interruption in order to keep a cohesive telling of his, of his version of events, the immigration judge each time picked up exactly where he had left off and said, you know, okay, sir, you were just telling us about X. So you were just telling us about Y. Please continue with what you were just telling us about. So in order to keep that, you know, level of continuity, the immigration judge did, I would say, a yeoman's job of making sure that that presentation, despite the interruptions for that, you know, what amounted to 20 pages in the transcript, but a section of his, of his direct to keep it flowing. And again, once it was, he was moved to another room, no problems whatsoever for the rest of the hearing. And I, one, I also, your honor, I brought up his many travels from many countries. One would, I would argue that, you know, he has no proof of that and he couldn't keep straight what he had done with his passport. Did the military take it? That's at AR 125. Did he have it all along? That's at AR 171 through 173. Did he destroy it in Panama? That's at AR 184. And, you know, from experience as a federal criminal attorney, we always told the jurors, you know, the truth is easy to remember. It's the lies and the stories that are hard to keep straight. And I think that Petitioner had a difficult time explaining away the inconsistencies in his testimony and his documents. And at the end of the day, the burden of proof cannot be overcome in this case. The record simply does not compel the And if the record does not compel that conclusion, then the rest of his version of events just fall away. Do you think his uncle, how do you, his uncle could not have helped with that? I don't know if his uncle could have helped him with that or not. Exactly, but the pad is sitting right there in the court. Yet that becomes the sine qua non of this. You said it very well. You said without that, that's the crux of it. But here's someone sitting right there. And because what, because the whole idea is because he heard what he said, what I found is interesting that the witness can come with you and been with you for 10 days, all this time, and just because magically they're not sitting in the courtroom when you testify, all of a sudden it's like night and day. I'm just, it's a whole lot at stake for these cases. It just seemed like it's, you know, I suppose, you know, something that's so important to a human being's life in terms of, we are, it's documented what's going on in the country, people with anglophones. We know that, there's no question about that. And someone makes it there, and someone, a witness there who you now say is a focal point, and you say, no, you can't testify. Well, I understand you have a duty to do to your client, representing attorney general, but it's interesting. Well, that's fine. Go ahead, you may proceed. Well, again, I would only, I would have to argue that, you know, again, I'm sort of not in a position to have perhaps a response, a better response, because it wasn't raised to the board, and it wasn't raised in the brief. So, I don't think the court really has jurisdiction to decide this case based on an issue that the government didn't have an opportunity to respond to. Counsel said it was referenced there. Well, I would invite, I would invite the court to double check that, because I think it's something that the board would have addressed, and certainly I would have addressed if it had been made a specific contention in this case. With that, I think I've made the points that I wish to make. If there's any other questions from the panel, I would submit on my brief. Thank you, Ms. Melamed. Thank you. Ms. Beach Oswald, you have some time reserved. Thank you, Your Honor. So, I think, Judge Gregory, your point about being rehearsed is leading to it not being consistent. I would say that in this record, he was extremely consistent. He was consistent with his Customs and Border Patrol Q&A. He was consistent with his credible fear interview at the border, despite having gone through all these countries and enormous fatigue and exhaustion. He was consistent on his application for asylum, his 589, both enlisting who was his siblings, who were his parents, what was his occupation, and when did he work at those particular places. Certainly, he did work in Douala. Douala is a real address. It's the central capital. Muyuca is a farm. There is, in Cameroon, there is no specific addresses for people with residences. Your Honor, I would also say that seeing counsel refer to them as anglophiles, that's not correct. Anglophones, because of everything that it implies, not just that they speak English, but that they're from the English zone, that they're born in this Northwest, Southwest, and right now, those people are being extremely targeted. The visa application, he did not fill out. That's the only thing that the counsel for the government was able to point out, and the marriage certificate, but at the same time as the marriage certificate was done, just about a month later or before, the birth certificate of the daughter specifically says Muyuca, and they're about an hour and a half distance, so everything is declaration, and all the totality of the circumstances of other documents certainly do in favor of the fact that the respondent has consistently been truthful, consistently said the same thing. There is, he was only asked questions, he said, for about five minutes. I've been to consular interviews many times. That's sort of the procedure. I've also been an immigration attorney for 30 years. I've been before this particular judge many times. She's a good judge. However, in this case, I think she was extremely frustrated and rushed, and you're honored. In my experience in 30 years, it's always the judge in immigration court who says, would you like to sequester your witnesses? That's what the judge says, and if the judge doesn't bring it up, the government brings it up. I've never had that not happen. Ms. Beach-Oswald, so on that point, you had about 20 minutes, I guess, while your colleague on the other side was arguing on behalf of the government. I hope to look at your brief and or reply brief. Can you point us to where exactly that issue was preserved? The issue of the uncle not being able to testify? Yes, ma'am. Right. It was not discussed as an issue per se. What does that mean? It either was or it wasn't. Well, it talks about him being in court in the government's favor. Page nine. Where? I would be happy to try to find that, your honor. I'm sorry. I don't think it's there, is the bottom line. You're making an argument that simply isn't preserved, and you're sort of suggesting and dancing around it, and I frankly don't appreciate that. So either it was or it wasn't. I do see in a footnote, your honor, in the government's brief. It's addressed on page nine. Government's brief? You're relying on the government's brief? No. We do discuss the witness, Mr. Fomenka, your honor. We do not say that it was a violation. Where? Tell me where it is. Where is it? It's in the credibility section, your honor. You are correct in that it's not specifically referenced just as part of the totality of circumstances, your honor. It is in the record, however, his testimony and... You can see that if you didn't raise it in your brief, that it's waived. I would say that it is part of the credibility issue, and in all fairness, it was not raised as a separate issue. I would say that it's tangentially in there, but it is not raised as a specific issue, your honor. We would not agree necessarily that it's waived, because it is part of his credibility and totality of circumstances in the record. All right. Counselor, your time is moving on. This is past. I have no further questions, except, your honor, to say that in Russo, Mr. Leckie, who spent many months in the jungle and in the forest, I guess he refers to as, his wife and his child had malaria. This is a situation where he had severe harm, a past persecution, and he certainly still has well-founded fear of future persecution. In the record, there is testimony also by Mr. Leckie himself. He writes the letters to his counsel, saying he can't understand her because she speaks American English, and saying that she wasn't able to visit him because there was an outbreak of measles. So, there was a lot of problems, as there are in many immigration cases.  Asylum applications. So, I'm very familiar with the fact that the family has been persecuted with his uncle. I have nothing further to say, your honor. Thank you, counsel. Ms. Beach Oswald and Ms. Melnyk, we can't come down and greet you as we would like to, but please know that we appreciate your argument in these very difficult cases, and you did a great job in presenting your prospective client's positions, and I would hope that you would stay safe and be well. Thank you so much. Thank you, your honor. Thank you.
judges: Roger L. Gregory, G. Steven Agee, Albert Diaz